I have a moment of your honor. Surely. Mr. Erickson. Yes, may it please the court. As the court knows, there's three processes of EEI that are in issue in this appeal. I'd like to start with the original process, which the district court determined had infringed Claim 1 of the 937 patent. That determination is erroneous for at least three reasons, or for three reasons. The issues with respect to the 937 patent deal with the suspending material that's used in the drag-reducing agent. Claim 1 uses the restrictive language selected from the group consisting of water and water-alcohol mixtures to define the suspending material. Notably, although this is not in our brief, the invention section of the specification of the patent uses that same restrictive language. It's well established that restrictive language consisting of a patent claim means I claim what follows and nothing else. That's one of the express holdings in the vehicular technology case cited in our brief. That holding is in accord with the prior precedence of this court and its predecessor courts. Notably, two cases not cited in our brief were the Abbott Labs case reported at 334, F3-1274, pinpoint 1281, and the Mannesman case reported at 793, F2-1279, pinpoint 1282. Have you called those cases to the attention of your opposing counsel? Other than right now? No, sorry. That's, I think, in the future, as a courtesy to opposing counsel, give them a chance to respond. There's also another case recently decided by this court, the Norian case, December 5th, 2005. Norian against Stryker, is that the case you're talking about? Yes, Your Honor. So when claim one calls for a suspending material selected from the group consisting of water and water-alcohol mixtures, as a matter of law that means the suspending material must contain water and nothing else or water and alcohol and nothing else. It is undisputed that the alfol-2 that was used in EEI's original process contained substantive amounts of other chemicals besides water and alcohol. And as a matter of law, for that reason, the suspending material used in EEI's original process did not satisfy claim one of the 937 pattern. When you say other substances, you're really talking about the MIBK, right? Well, there's the MIBK, there's the ammonia, there's the heptane, and they're set out in the chart. I believe it's on page 8 of the blue brief. But what evidence is there in the record to show that the MIBK did assist in the suspension? Why was the MIBK used? The MIBK is in, pardon me, denatured alcohol, Your Honor. So it's not drinkable? Yes. It makes it not drinkable. Yes, sir. That's correct. And that's what EEI bought to use as a suspending material in its original process. It didn't have water and alcohol and nothing else. But the MIBK, I'm sorry, go ahead. But did the MIBK actually act as a suspension? He coughed and I didn't hear you. I'm sorry, Your Honor. Did the MIBK act as a suspension? No. I don't think so, Your Honor. There's no evidence of that that I know of. So it was not a suspension element. It was only used for the specific purpose of making it non-drinkable. I'm sure it would affect the suspension somehow, Your Honor. But there's no evidence in the record that it did. I don't know of any. That's correct. Well, your expert on his deposition called all those extra chemicals impurities. And there was some argument that impurities could be associated with the consisting of ingredients and still satisfy the claim. Well, I think, Your Honor, in that regard, the impurities, if we're going to include the possibility of impurities in the consisting of language, have to be impurities ordinarily associated with the claimed elements, i.e. impurities of water and a water-alcohol mixture. And there's no evidence at all that these other chemicals that are in the denatured alcohol are impurities of a water-alcohol mixture. Well, there was some argument, at least, that MIBK was always in denatured alcohol. Yes, but I think— Used for industrial purposes. There was that argument, but I think the focus has to be, in the first instance, when we're construing the claim, on the claimed compounds, water, alcohol, and what are the impurities ordinarily associated with water and alcohol mixtures. I wonder if one way of looking at this issue is to say that the term alcohol, in a purely chemical sense, at least with respect to ethanol, is a particular substance, but when you use it in the context of a reference to the commercial use of alcohol, that it naturally includes, ordinarily, MIBK, and therefore water-alcohol in this context includes a component that denatures the alcohol. I mean, if I go to the drugstore, for example, to buy a bottle of alcohol, I'm not going to get 100 percent or even really very close to 100 percent alcohol. It will be alcohol, but it will be 91 percent, typically. Right. But I would call it alcohol. Okay. And if I mixed it with water, I would call that an alcohol-water mixture because the 9 percent that's left over basically just goes with the product alcohol. Isn't that a reasonable way to look at the use of the term alcohol in the context of this patent? I'm sorry, Judge. I wasn't clear, perhaps. Well, what I'm saying is can you view the term alcohol as used with reference to an industrial substance as already incorporating the MIBK component that needs to be included in order for that alcohol to be used in an industrial setting? I guess you can, but I think we still need to focus on the claim language first and on the claim compound, and if we're going to include impurities, they have to be impurities ordinarily associated with a water-alcohol mixture, which there's no evidence that MIBK is ordinarily associated with a water-alcohol mixture. Okay. The second point I'd like to make is what is the district court's interpretation of the amount of water that needs to be in a water-alcohol mixture? The district court interpreted this amount as being satisfied by a more than negligible amount of water, and the district court also indicated that the suspending material must be made with some non-inconsequential amount of water. The words negligible and non-inconsequential are nowhere to be found in the 937 patent, but what the 937 patent indisputably teaches is that a water-alcohol mixture usually has a minimum of about 30 percent water and more usually 50 to 70 percent water by weight. The two examples in the patent have water content of 50 percent weight. If we look at the entirety of the specification, we don't find anywhere where there's a description of a water-alcohol mixture that could range between 2 percent water and 100 percent water, which would occur under the district court's interpretation. And Conoco, I submit, is just not entitled to a construction of the amount of water in a water-alcohol mixture which is divorced from the specification, and that's exactly what occurred in this case. There are two very recent cases decided by this court, the Aquatex case and the Nystrom case, both of which support the proposition that the minimum amount of water in a water-alcohol mixture, as that term is used in the 937 patent, should be 30 percent. And the alfol, too, used in the original process, did not have anywhere near that amount of water. Stable is the other term with respect to the 937 patent. The specification defines stable as that the suspensions obtained by the described procedures are homogeneous dispersions, stable, non-agglomerating, and may be shipped over long distances while retaining those properties. There's absolutely no evidence in the record, that I've found anyway, that shows that PEI's original product made by the original process satisfied that definition. If I would, I have a visual aid. We're going to turn now, and my time is fleeting. This is the equivalence issue on the 151. Yes, Your Honor, it is. We're going to turn to the 151 patent having to do with the doctrine of equivalence. Excuse me, counsel, one question. Yes, sir. With respect to the C30 plus wax, how is that chemically different from the fatty acid wax? Is there a difference? It is, and Your Honor, I am not a chemist, and I cannot articulate it. When you get down here to the steramides, though, what distinguishes them from the fatty acid wax is the fact that they have a nitrogen, it's NH2 attached to the molecule, nitrogen and two hydrogens. And that's the amine part of it, as I understand it. And that distinguishes them from either PE wax or C30. Which are pure hydrocarbon waxes. Pure hydrocarbon waxes, yes, Your Honor. And for the district court, well, Claim 21 issued its Claim 1 in the 151 patent, and it started out claiming any partition agent which is represented by the big box. There was an amendment to Claim 21 which narrowed Claim 21 to fatty acid waxes. Then there was an argument in the trademark office that narrowed fatty acid waxes to steramides and other amide derivatives. This green part on the chart here. The district court flatly vitiated the claim limitation when it found that C30 plus wax satisfied the fatty acid wax limitation under the doctrine of equivalence. Let's set aside for a moment the amendment aspect of your argument and assume, as the appellees argue, that that was just effectively a correction of a ministerial error and was not intended to be a contraction of the scope of the claim for purposes of patentability. And just look at the argument aspect in which the argument was made that steramides were disclaimed as a subset, what otherwise would have been a subset of fatty acid waxes. Why would that disclaimer also constitute an implied disclaimer of the pure hydrocarbon waxes? Well, I think if I understand your question, that would be a situation where the argument reduced the scope down to the grain level on the chart. But starting with the bottom half of your chart. Right. And you reduced the scope of the bottom half by removing some elements. But why does that affect the question of whether equivalents are still available to other substances? The answer to your question is this, Your Honor. Based on Festo, they, Conoco, are presumed to have surrendered this area between the original claim limitation, which we're assuming contained fatty acid wax, and the narrow claim limitation, which is, by argument, steramides and similar amide derivatives. Festo says they're presumed to have given up this area. Festo further says, and I think by Agro, the case cited in my reply brief further, indicates that this is the area that they're presumed to have given up. They can show, if they can overcome the presumption of Festo, they may be able to snare something in that area. But nothing's going to let them go out of that area in the first place, go broader than the original claim limitation, which we're assuming for purposes of this question was fatty acid wax. They've gone broader than the original claim limitation. So you're using Festo in the context of an argument as opposed to an amendment? Yes, Your Honor. But because the Elkay case says that Elkay and, pardon me, amendments made, I mean, argument, estoppels created by arguments as well as amendments. Well, but the question would be, is the same kind of analysis under Festo applicable? I think it is, Your Honor. I submit it is. It has to be, or it has to be, in my view. Have we so stated? I didn't think the Elkay case said just that. It did not say just that. That's me talking, Your Honor. Okay. And there's also the issue of disclaimer. I'm running out of time very quickly. Disclaimer, they said use of fatty acid waxes are necessary. You could use fatty acid waxes with non-fatty acid waxes, but the fatty acid waxes have to be in a distinct majority. That's a disclaimer of using only non-fatty acid wax. And that's what EEI did in its second process, which was called the current process by the district court, and what it did in its reformulated process in using PE wax. So that ends my time except for seven seconds. Well, I will reserve your rebuttal time and restore it, rather. So let's hear from the appellees then. Mr. Cernel. Good morning. May it please the Court, Marcus Cernel on behalf of the appellees. Your Honor, starting with some discussion of the consisting of limitation, I'd like to start there. What they're seeking, what EEI is seeking on appeal here, and they have not sought this construction before. This is not a construction they sought at the district court. We think it's a waived argument, but getting to the argument, they're seeking a construction that divorces this term consisting of a water-alcohol mixture from reality. And this court has repeatedly stated that clamp construction must be done, it must be grounded in the reality of one of ordinary skill in the art. And as Your Honor pointed out, when one of ordinary skill in this art goes and looks for an industrial alcohol, they will be denatured alcohols that have impurities such as MIBK in them. There is a bit of a dispute as to the state of the record evidence on that issue. Can you point us to where we should look to ascertain whether that point was in the record? They cited in their reply brief various places where they thought that they had preserved the issue. No, I don't mean the preservation. I mean the question of whether MIBK is invariably associated with alcohol in an industrial use. I believe that's at 82971 and 272 in the record, where their expert testified that typically these denaturing agents such as MIBK are associated with commercial alcohols. And again, on 2972, it's in the record. The district court properly relied on that evidence from EI's expert, that MIBK was both an impurity and an impurity that was ordinarily associated with commercial alcohols. So what we have here is they're trying to construe this in a vacuum, ignore the reality that one of ordinary skill in the art understands, and exclude everything, including impurities that are normally in alcohols. The district court properly looked at this through the prism of one of ordinary skill in the art and found that what was in there, the non-alcohol, non-water components, were impurities and properly found this claim to be infringed. Is there any evidence in the record to show that the MIBK does help in the suspension? I don't believe there's any evidence of that, Your Honor. So it's totally an impurity? It's totally an impurity, totally there just to, again, poison the alcohol so that it can't be drinkable, so you don't have to pay tax to transport it over state lines. Well, of course, the concern here, as your opposing counsel raises, is that there's a danger of moving to the basic legal test for consisting essentially of, which would be a substance that doesn't have a material effect but nonetheless is present, as opposed to consisting of, which is necessarily a narrower standard. As is laid out, I think, in the ex parte Davis case and we laid out in our brief, I think it's very clear the difference between consisting of and consisting essentially of. Right, but the problem with your argument is that it tends to, perhaps it doesn't cross the line, but it sort of nudges up against the line, and so I'm looking for guidance from you as to what it is that clearly justifies putting this substance on the consisting of side of the line as opposed to consisting essentially of. Well, you know, you look at consisting of and it excludes everything else. Consisting essentially of, you can add in anything in the world that doesn't change the basic novel and characteristics of the claim. With consisting of, you're limited to water or water-alcohol mixtures. We had a water-alcohol mixture with impurities ordinarily associated with the recited elements. That's what consisting of says, and it's a closed claim. We agree with that, but you need to look at it through the prism of one of ordinary skill in the art, and one of ordinary skill in the art understands, especially in this industrial context, you're going to use alcohols that have a denaturing agent like MIPK in it, and that's why this falls on the consisting of side of the line. With respect to, and then the district court's finding, again, not clearly erroneous, we move out of claim construction into the factual finding, not clearly erroneous to rely on their expert's testimony to find that this element was present. With respect to the water-alcohol mixture element, what EEI argued below. Normally the impurities, I mean, it seems to me that this is kind of stretching the term impurities. I mean, I recognize that the term was used in the evidence, but you think of normally impurities as, you know, two parts per billion of yesterday's ham sandwich finds its way into a vat of some substance, and that's not going to be enough to take it outside of the consisting of language, for sure. But this is more than what you would normally think of as an impurity. That is something that somehow necessarily comes along with any, as a chemical matter. It can't be eliminated. It necessarily comes along with the chemistry. This is something somebody intentionally put in as another ingredient, for reasons that may have everything to do with the legal requirements, et cetera, et cetera, but nonetheless was placed in. And that seems to me different from the normal context of impurity. I guess the answer to that would be going back to looking at this from the perspective of one of ordinary skill in the art. Right. One of ordinary skill in the art says, okay, I want to practice this claim. Let me go get an industrial chemical to practice this claim. You go and get an industrial chemical, a water-alcohol mixture, it's going to have MIBK in it. It doesn't matter why it's there, and probably the scientists would prefer it not be there, but because of the tax laws and the denaturing requirements, it's there. It's an impurity. It's not useful. It doesn't provide any suspension capabilities, and that's the way one of ordinary skill in the art would look to practice this claim. Okay. Moving on to the water-alcohol mixture element, EEI argued below and is arguing here that there should be some kind of minimum percentage of water, a 30 percent minimum limit, and I think that goes against this court's case law. The court's case law has stated many times that if there are no numerical limitations in the claim itself, they should not be imported into the claim from the specification. Here we not only have a limitation or they're trying to import a limitation from the specification, but the specification states very clearly that the percentages of water and alcohol may vary widely and then gives the preferred ranges, and so I think it's improper to do it under the case law, but it's very clear in the specification. It instructs the people of ordinary skill that this limitation or this range does not limit the claims, as EEI is arguing here. With respect to the stable limitation, I believe that the district court didn't really even construe the term. It just kind of applied the term stable and non-agglomerating as it appeared. There was testimony in the record that said that people of ordinary skill understand this term, and the district court properly relied on the evidence, and it's at the red brief at page 50, that showed that their EEI's product was stable and non-agglomerating and was understood as such by people of ordinary skill. So that's with respect to the 937 patent. As Mr. Erickson, I think, pointed out, the issues in this case, the 937 patent relates to one product. The 151 patent relates to a separate product. There were separate findings of infringement with separate damage awards. The 151, could you address that? Sure. I will address that. I guess to start out, with due respect, I think that there's been some confusion here between amendment-based estoppel and argument-based estoppel, and this court has instructed many times that these are two separate doctrines with two separate sets of law that apply. So first, with respect to the question. Let me go just to the crux of the argument that's made here today. Do you think that setting aside amendment-based estoppel for now and just assuming that we'll, for present argument purposes, that we'll treat that as not having been a pertinent amendment, but based entirely on argument estoppel and or any limitation in the scope of equivalence that may stem from the specification, statements in the specification. Do you think that FESTO applies in the argument disclaimer setting? My understanding is that FESTO applies only in the amendment-based setting and not in the argument-based setting. Do you know if we have any law to that effect so saying? I think we cited a case in our brief that said that these are two separate doctrines. Well, they are. I just wondered if you've ever said FESTO doesn't apply in the following setting. I'm not aware of an express articulation of that, Your Honor, but it's my understanding that these are two separate doctrines and FESTO is clearly an amendment-based estoppel doctrine. All right. So with respect to the amendment-based estoppel. Argument-based. Well, do you want to hear argument-based? Yeah. Let's talk about argument-based. Okay. Argument-based. The arguments that were made during prosecution very clearly focused on the prior metal stearate partitioning agents. This was always a discussion of the fatty acid wax partitioning agents are different from and there are criticalities of using fatty acid wax partitioning agents that separate them from the metal stearate partitioning agents. There was never any discussion of the EEI hydrocarbon waxes during prosecution. The focus was always on, and they did surrender, metal stearate partitioning agents, but that is not what the court found to be equivalent. The court found as equivalent the hydrocarbon waxes that EEI uses. Here's what, I'm sorry, Judge Graves has for a while. That was the C-30. I'm trying to get to the point where is there an equivalence between the C-30 wax and the fatty acid wax or the sternites? Yes. What is the equivalence? The district court applied both the interchangeability test as well as the function way result test, and I believe the findings of fact were at, laid out about 29 findings of fact on that specific issue. But they are chemically different. They are chemically different. There's an amide group, and we're not asserting literal infringement here. Well, this is under DOE. Correct. Correct. And the court looked at does the hydrocarbon wax perform substantially the same function in substantially the same way to achieve substantially the same result, and found that they did, and also applied the interchangeability test. And, in fact, the district court went even further, and we put on evidence that showed applying the same test, let's apply the same function, way, and result, and look if we've done it too broadly to see if it covers the metal steroids, and showed that it wouldn't work for the metal steroids, kind of as a check on the function way result test to make sure it wasn't being read too broadly and that it was properly applied such that it showed that the hydrocarbon wax was an insubstantial difference from the fatty acid wax in the claim. What gives me pause here about that argument is that as I understand the chemistry, the metal steroid is much closer to the fatty acid than the pure hydrocarbon acid is. That's actually incorrect, Your Honor. There's testimony in the record from EEI's own expert that the metal steroid and the hydrocarbon waxes are on completely two ends of the spectrum. The polarity of these materials is what matters for how they interact with the alcohol suspension in the polymer, and there was testimony that the metal steroids are the most polar, hydrocarbon waxes are the least polar, and the fatty acid waxes were right next to the hydrocarbon waxes on the end of the continuum. And so in chemical terms, the two waxes are much more alike than the metal steroids. I think what Your Honor is focused on is a statement in the prosecution history by the examiner where they were wondering whether if there was some terminology used to define the fatty acid wax, whether that might confuse it or might be argued to go back onto the metal steroids if you construed fatty acid wax in a certain way. And that's why the examiner kind of came to this steramids and similar amide derivatives to avoid that potential for confusion. But with respect to how these chemical constituents actually interacted in the suspension, the testimony was that the waxes of EEI and the fatty acid wax were very similar and the metal steroids were different. Well, perhaps it's a function of its structure. The structure of the metal steroids looks a lot more like the fatty acid waxes as I view the structure as opposed to the hydrocarbon waxes, which is just a chain of alkenes. Yeah. Well, there's a functional group with respect to both the fatty acid wax and the metal steroids. But the issue is the metal steroids have metal in them. It creates a very polar charge on the end, whereas if you just put an amide group, it's not really different than having a straight chain hydrocarbon. So that's kind of the chemical explanation as to why the waxes are very similar and work. And again, the metal steroids don't. Now, how about the statement in the specification? Let me see if I've got the right statement. It is necessary that the weight of non-fatty acid wax partitioning agents be in a distinct minority. I think if you look closely at that statement, I think there's a couple of statements in the specification. Always right after that statement about it being necessary, it's always talking about comparing it to the metal steroids. You need the fatty acid wax as compared to the metal steroids because the metal steroids will not work in an alcohol suspension. And every time there's a discussion of fatty acid wax being necessary, of course, it's in the claims. It's in all the claims. But whenever they distinguish any prior art, they're always talking about the metal steroids that will cause agglomeration products, all this stuff to stick together. And the testimony was, again, the district court and we put on evidence that compared functionally result and showed the metal steroids won't work, but the EEI waxes work exactly the way the fatty acid waxes do in the patent. So to sum up, I think the district court, you can go through and see that there's 312 findings of fact and 64 conclusions of law. It was a very well-reasoned and methodical application of all the proper legal doctrines here, and we think the district court got it right and should be affirmed. Thank you. And unless there's other questions, I'll cede my time. Questions? Thank you. Mr. Erickson, I think we've given you back your three minutes, so feel free to take as much as you need of it. I'll try to be brief. First, with respect to the waiver issue that was brought up in Conoco's argument, the waiver issue pertaining to the consisting of language, as we pointed out in our brief, there are a number of instances in which that was brought up in the district court. Most telling is when it was brought up in my motion to stay execution of the judgment pending appeal, I argued that we should win on appeal because of the consisting language. Conoco didn't say in response to that motion, we waived that argument. They said we're just tracking out arguments that we've made before that have been considered by the court and rejected. And more significantly, the court agreed with that language that those arguments had been brought up before. With respect to the consisting of language, what they're trying to turn this term consisting of into is consisting essentially of or even comprising. And if you don't close the set to elements other than the recited elements, that's exactly what's going to happen. The Abbott Labs case that I referred to earlier, that's not in our brief, indicates that when a patentee does not claim anything other than thus, without expressly indicating the selection of multiple members of a MARCUSH grouping, that was the issue in that case, a patentee does not claim anything other than the plain reading of the closed claim language. And the plain reading of the closed claim language in this case is water and water-alcohol mixtures. With respect to the amount of water in a water-alcohol mixture, you cannot read the specification in a vacuum. There is no description in the specification of the 937 patent of a material that has 2 percent water in it. The lowest description that's there in that patent is at least about 30 percent, or about 30 percent, usually about 30 percent. The 15 percent maximum that EEI had in its initial process, or original process, was nowhere close to that. As the court pointed out in the Aquatex case, and in the, well, in the Aquatex case, the issue was, what does fiberfill batting material mean? And the court decided there, based on the specification and the prosecution history, also was involved that that fiberfill material should be limited to synthetic materials. C30 wax, PE wax, there's hydrocarbon waxes. The evidence we have in front of you shows that PE wax was known in the prior art, in Conoco's own 1985-86 vintage patents. They're indistinguishable from one another per Conoco. The doctrine of equivalence cannot be used as a matter of law to cover something that they could not have covered in the first instance when they filed the application for the 151 patent. Thank you. My time is up. Very good. Thank you, Mr. Erickson and Mr. Sernell. The case is submitted.